## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SUSAN BOWERSOX, | : | Civil No. 4:18-CV-00384 |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| COMMONWEALTH OF | : | |
| PENNSYLVANIA DEPARTMENT OF | : | |
| CORRECTIONS, *et al.*, | : | |
| | : | |
| Defendants. | : | Judge Jennifer P. Wilson |

## <u>MEMORANDUM</u>

This is an employment discrimination case brought by Plaintiff Susan

Bowersox ("Bowersox"), who was formerly employed as an equipment operator

by Defendant Pennsylvania Department of Corrections ("DOC").  Bowersox

alleges that she was discriminated against on the basis of sex in violation of Title

VII of the Civil Rights Act of 1964 and the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution, made actionable under

42 U.S.C. § 1983.  Currently before the court is Defendants' motion for summary

judgment.  (Doc. 44.)  The court finds that there are disputes of material fact which

preclude the entry of summary judgment in this case.  For the reasons that follow,

Defendants' motion for summary judgment will be granted in part to foreclose

Bowersox from maintaining a cause of action based on any alleged adverse

employment actions other than her termination, and denied in all other respects.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

Bowersox was employed as an equipment operator for the DOC between August 2015 and July 2016.  (Doc. 8, ¶¶ 16, 26.)  As an equipment operator, Bowersox was responsible for driving tractor trailers and box trucks to transport laundry to and from various DOC institutions, among other locations.  (*Id.* ¶ 17.) During her employment, Bowersox reported to Defendant Matthew Vozniak ("Vozniak"), her immediate supervisor, and Defendant William York ("York"), a manager for Corrections Industries, a bureau of the DOC.  (*Id.* ¶¶ 7, 9; *see* DEPARTMENT OF CORRECTIONS, *Pennsylvania Correctional Industries*, https://www.cor.pa.gov/PCI/Pages/default.aspx#:~:text=Pennsylvania%20Correcti onal%20Industries%20(PCI)%20is,government%20entities%20located%20throug hout%20Pennsylvania (last visited Feb. 10, 2021).)  At the time she was hired, Bowersox was the only female employee working as an equipment operator for the DOC out of SCI-Benner.  (Doc. 8, ¶ 20.)

Bowersox notes that her journey to employment as an equipment operator spanned two or three years and several interviews, all of which resulted in other, allegedly less qualified male candidates being selected for the position.  (*Id.* ¶ 14;

---

[1] In considering Defendants' motion for summary judgment, the court relied on the uncontested facts, or where the fact were disputed, viewed the facts and deduced all reasonable inferences therefrom in the light most favorable to Bowersox as the nonmoving party in accordance with the relevant standard for deciding a motion for summary judgment.  *See Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 362 (3d Cir. 2008).

Doc. 69-1, pp. 46, 56; Doc. 55-1, pp. 19–22 (demonstrating that Bowersox had significant experience operating large trucks).)  In October 2014, Bowersox filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") against the DOC, alleging that it had repeatedly failed to hire her in favor of younger, less-qualified men.  (Doc. 8, ¶¶ 13–14; Doc. 55-1, pp. 1–3, 32.)  However, it does not appear that Bowersox pursued this charge past the initial EEOC filing because she was hired for the equipment operator position in July 2015.[2]  (Doc. 55-1, p. 32.)  Bowersox did not begin her equipment operator duties immediately.  (Doc. 70-6, p. 9.)  Rather, it appears that she was only approved to begin driving CDL vehicles on August 28, 2015 when she was given the green light from human resources.  (*Id.* at 3–5.)

After assuming her full driving duties, Bowersox alleges that she was subject to disparate treatment; specifically, that she received "excessive scrutiny of her work performance and unfair negative evaluations."  (Doc. 8, ¶ 21.)  For example, Bowersox claims that she was subject to pre-trip inspections, frequent check-ins from her supervisors, and frequent reprimands which male co-workers did not receive.  (*Id.* ¶¶ 21–22; Doc. 69-1, pp. 106–07 (noting that men were often

---

[2] Director of Corrections Industries, Anthony Miller ("Miller"), admitted that he was under the impression that Bowersox was hired because she is a woman.  (Doc. 71-11, p. 61.)

treated differently than her).)[3]  In addition, Bowersox claims that she did not

receive adequate training or the same opportunities to become proficient at her job

as other male employees.  (Doc. 8, ¶ 23.)  Specifically, she notes that Vozniak

began taking notes on her performance and keeping a journal documenting issues

from the first week that she began driving, despite the fact that she remained in

training with other, more experienced drivers.[4]  (Doc. 55-2, p. 252; Doc. 55-3,

pp. 76, 271–76, 279; Doc. 69-5.)

Bowersox admits that she had some difficulty early on in her employment,

but maintains that she quickly adjusted to the demands of her position and became

a better and more efficient employee.  (Doc 69-1, pp. 70, 74, 78, 81, 84, 87, 95, 98,

107–08.)  She recalled that during her first few trips, she had a little trouble

backing up to the docking area at various institutions, but that her ability to back

up the truck improved with time.[5]  (*Id.* at 70, 74.)  Bowersox testified to similar

---

[3] In contrast to this assertion, Bowersox equivocally testified that she did not recall any instances where she was discriminated against on the basis of her age or gender.  (Doc. 69-1, pp. 86–87.)

[4] It appears that this journal was started at the request of Miller around August 26, 2015.  (Doc. 55-3, p. 279 (noting that Miller had requested a daily report of Bowersox's activities, including the date and time of incidents, the unit number of her assigned truck, and any instructions she had been given).)

[5] Bowersox also noted that she received encouragement from other drivers during her training period in addition to pointers on how to back up the truck so that it would be square with the docking area.  (Doc. 69-1, pp. 71–72, 74, 107.)  York also testified that he offered Bowersox the option for additional practice if she would like it.  (Doc. 72-1, pp. 23–24.)  Bowersox's testimony is supported by SCI-Forest corrections officer Kevin Engelhardt, who noted that Bowersox had no difficulty backing up her truck toward the end of her time coming to the

situations regarding directions to the various correctional institutions on her routes and filling out inspection logs. (*Id.* at 84, 95, 107–08.) She noted that she may have had trouble recalling routes and completing inspection logs during her first or second trip, but not thereafter.[6] (*Id.*) Bowersox also testified that she remembered locking her keys in her truck on two occasions, and that she left with the keys to her truck one evening, but that she quickly realized her mistake and returned the keys to Vozniak after he called her. (*Id.* at 81, 97, 100–01.)

Bowersox testified that she was reprimanded or counseled regarding many of these instances, but that when other male employees made similar errors, they did not receive the same treatment. (*Id.* at 80, 98, 101, 106–07.) Specifically, she noted that male employees left items at the various correctional institutions that she was asked to retrieve, that these employees missed the Forestry camp stop on their routes, returned late from their routes, and locked their keys in their trucks, but that they were not reprimanded to the same extent that she was. (*Id.*)

In contrast to Bowersox's recollection of her employment record, Defendants assert that Bowersox was terminated because she presented a safety concern for the correctional institutions that she frequented and was otherwise not

---

institution, and that it took her about five minutes to back the truck up to the dock. (Doc. 71-1, pp. 41, 43.)

[6] For instance, Bowersox testified that she missed the Forestry camp stop on her route one time that other drivers routinely miss, but that she did not forget it again. (Doc. 69-1, p. 98.)

improving enough to pass her probationary period.  Vozniak testified that,

beginning August 26, 2015, 10 days after Bowersox commenced her employment,

he began keeping a journal of each instance in which Bowersox had performance

issues because he recalled her struggling during the early days of her employment.[7]

(Doc. 69-2, pp. 92, 94–95.)  Vozniak recalled that Bowersox forgot routes and

stops,[8] returned from her routes later than other drivers, frequently locked her keys

in her truck, received complaints from correctional institutions regarding her

performance, failed to properly complete pre- and post-trip documentation, and

took too long to back up tractor trailers without improvement.[9]  (*Id.* at 78–79, 81,

88, 98, 108, 134–36, 144, 148–50, 205, 208, 211, 213–14, 224, 237, 245; Doc.

---

[7] Vozniak relayed that he created the journal after Bowersox failed to navigate her routes in a
timely manner, locked her keys in her truck, was unable to lift the hood of her truck, and failed to
correctly complete pre- and post-trip forms.  (Doc. 69-2, p. 93.)  He also noted that the journal
was not a comprehensive listing of all of Bowersox's performance issues.  (*Id.* at 142, 235.)  In
other words, Vozniak asserted that Bowersox continued to have performance issues, but that he
stopped writing them down every time.  (*Id.* at 142.)  Vozniak also recalled that he did not tell
Bowersox that he was maintaining the journal or inform her of every documented incident in the
journal.  (*Id.* at 98.)  However, Vozniak continuously updated the journal and relayed these
updates to his colleagues.  (*See* Doc. 69-5; Doc. 70-3; Doc. 70-4; Doc. 70-5; Doc. 70-7; Doc.
70-10; Doc. 70-11; Doc. 70-13.)

[8] Vozniak noted a specific incident with Bowersox when he rode along with her on a trip to SCI-
Muncy during which she missed the proper exit to reach the institution, attempted to correct this
error by turning around in an area reserved for emergency vehicles, and then made a wrong turn
when leaving the institution, despite the fact that she had been to SCI-Muncy on four prior
occasions.  (Doc. 69-2, pp. 78–79, 81, 88.)  He also noted that she frequently needed to call in to
receive directions to various institutions regardless of how many times she had been there before.
(*Id.* at 134–36, 211.)

[9] Vozniak related that every time he watched Bowersox back up a tractor trailer, it took her
between 20 and 25 minutes, whereas other drivers could complete this task in 3 to 4 minutes.
(Doc. 69-2, pp. 237, 245.)

69-3, p. 3; Doc. 69-8.)  Vozniak, and other supervisors and equipment operators,

appeared to believe that Bowersox should have arrived as an equipment operator

with these skills, and seemed frustrated that they needed to train her.  (Doc. 69-2,

pp. 118, 131–32; Doc. 69-9, p. 4; Doc. 70-8, p. 3; Doc. 71-13, p. 65.)  As a result

of this allegedly poor performance, Bowersox received some verbal counseling,

but Vozniak noted that not every instance of counseling was documented, and that

Bowersox was not counseled for every offense.[10]  (Doc. 69-2, pp. 98–100, 109,

144, 152–54.)

At some point during Bowersox's probationary period, Vozniak conducted a

progress review covering her performance from August 2015 through February

2016.[11]  (Doc. 69-12, p. 2.)  The progress review noted that Bowersox had locked

---

[10] Indeed, Vozniak's documentation appears spotty at best, with Vozniak testifying that he remembered many more alleged instances of poor performance than were documented in his journal.  (*See id.* at 151–161, 200, 205–06, 211, 235.)

[11] The court notes that the dates on Bowersox's progress review are internally inconsistent. Specifically, the face of the review notes that Bowersox's performance is being evaluated from August 2015 through February 2016, but the review was not signed by Bowersox or Vozniak until May 20, 2016, well after the date range that the review purported to cover.  (Doc. 69-12, p. 2.)  Moreover, Bowersox's subsequent employee performance review noted that her progress review was conducted on February 19, 2016, six days before the fact-finding mentioned in the progress review and almost three months before Bowersox and Vozniak signed the review. (Doc. 70-30, p. 4.)  The fact that this review was actually conducted on May 20, 2016 was later confirmed by the transcript from the pre-disciplinary conference at which Vozniak noted that the review was overdue, and Chris Linn, the committee chair, confirmed that the review was not completed until May 20, 2016.  (Doc. 69-15, p. 4.)  Brad Basehore ("Basehore"), the assistant director for Correctional Industries, Vozniak, and York noted that progress reviews are ordinarily conducted three months into the employee's probationary period, and employee performance reviews are ordinarily conducted six months into the probationary period to give the employee

her keys in her truck on four occasions, and that she received a coaching session on this issue on December 14, 2015.  (*Id.*)  In addition, the review mentioned that a fact-finding was conducted on February 25, 2016 relating to Bowersox locking her keys in her truck.[12]  (*Id.*)  Finally, the review indicates that Vozniak had a conversation with Bowersox on October 15, 2015 regarding Bowersox's view that she was being treated unfairly resulting in Vozniak's consolation that the speed with which she made deliveries would "improve with time."  (*Id.*)

In response to her allegedly poor performance, as documented by Vozniak's journal entries and frequent email updates, and some incident reports filed by a fellow equipment operator and a corrections officer,[13] Bowersox was removed from her equipment operator duties at Miller's direction, and assigned to work in

---

constructive feedback that can improve their performance.  (Doc. 70-1, p. 69; Doc. 69-2, p. 241; Doc. 72-1, p. 18.)

[12] The court notes that there is nothing in the record to support the statement that a fact-finding occurred on February 25, 2016 regarding Bowersox allegedly locking her keys in her truck. Rather, the only evidence of a fact-finding in the record is the one conducted on March 15, 2016 regarding the assertion that Bowersox was a safety and security risk at SCI-Forest.  (Doc. 69-9.)

[13] The first incident report was filed on August 19, 2015 by equipment operator Willis Swinehart and detailed Bowersox's alleged struggle to back a tractor trailer flat against a loading dock, her close calls with nearby poles and walls, and her leaving the truck running with the keys in the ignition after she left the truck.  (Doc. 69-4, p. 2.)  The second noted incident was in response to Bowersox allegedly coming too close to another corrections officer escorting her truck to the laundry dock area such that he needed to jump out of the way to avoid being hit.  (Doc. 71-1, pp. 48, 50.)  However, it appears that no incident report was filed with respect to this occurrence and the alleged victim stated that he did not need to jump out of the way to avoid Bowersox's truck.  (Doc. 55-4, pp. 99–100.)  Rather, he stated that Bowersox may have passed him too close for the existing weather conditions.  (*Id.*)

the laundry facility at SCI-Benner on March 1, 2016, pending a fact-finding.  (Doc.

55-4, p. 70; Doc. 69-9, p. 3; Doc. 69-4, p. 2; Doc. 69-5; Doc. 69-8; Doc. 69-12.)

Defendants conducted a fact-finding on March 15, 2016 regarding the reason that

Bowersox was deemed a safety and security risk by staff at SCI-Forest.  (Doc.

69-9.)  This fact-finding accused Bowersox of failing to remember the policies and

procedures for SCI-Forest, routinely forgetting items in the sally port, an inability

to open the hood of her truck on at least one occasion, an inability to efficiently

back the truck up to the dock, and being a safety hazard when she operated the

truck too fast on facility grounds and almost hit a corrections officer.  (*Id.* at 2–4.)

Bowersox denied these allegations, noting that she only left items at the sally port

one time, she has regular experience performing dock work, she was able to open

the hood of her truck without difficulty, and that she never exceeded 5 miles per

hour in the grounds of the institution or came close to hitting a corrections officer.

(*Id.* at 3–4.)  Despite Bowersox's contrary assertions, the fact-finding panel

concluded that she was "less than truthful during . . . the . . . investigation.  She is

not performing to the standards nor does she display skills that would suggest 30

plus years of tractor trailer driving experience as she reports." (*Id.* at 4.)  Thus,

administrative action was recommended for safety reasons.  (*Id.*)  By this time, as

of April 7, 2016, Ty Stanton, director of the bureau of human resources for the

DOC, testified that he was aware that Miller wanted Bowersox fired.  (Doc. 71 15, p. 81.)

A little over one month later, Bowersox received an employee performance review covering her performance from August 2015 through June 2016, at least three months of which Bowersox had been working in the laundry facility at SCI-Benner since she had been removed from her truck driving duties on March 1, 2016.  (Doc. 70-30.)  This employee performance review appears to be the result of a collaborative effort among various individuals who made changes or modifications to Bowersox's performance review despite the fact that Vozniak was the only individual responsible for conducting and compiling this review.  (*See* Doc. 69-2, p. 190; Doc. 70-23; Doc. 70-24; Doc. 70-25; Doc. 70-26; Doc. 70-27; Doc. 70-28; Doc. 70-30.)  The final draft of this review was largely negative, rating Bowersox's performance as unsatisfactory for most categories, and resulting in an overall rating of unsatisfactory for failing "to meet the job standards for the Corrections Equipment Operator Position."  (Doc. 70-30, pp. 5–7.)  The review was signed by Vozniak, York, and Bowersox on June 24, 2016, with Bowersox's noting that many of the negative comments leading to the unsatisfactory ratings were untrue.  (*Id.* at 7.)

On July 15, 2016, a pre-disciplinary conference was held, resulting in termination of Bowersox's employment due to unsatisfactory performance during

her probationary period.  (Doc. 70-33.)  Bowersox did not attend this conference,

noting that she was advised by her union representative that she did not need to

attend.  (Doc. 691, p. 104.)  At the conference, Miller found that:

> From the attached supporting documentation and the results of the PDC, it is apparent that Ms. Bowersox has not displayed a satisfactory performance of her job responsibilities as an Equipment Operator during her probationary period.
>
> The documented infractions and associated counseling sessions, fact findings, and pre-disciplinary conference clearly indicate that Ms. Bowersox can not satisfactorily perform her normal job duties but additionally she has not shown any form of improvement over the course of her probationary period.  She has repeatedly made the same mistakes with regards to security procedures, has not learned or retained her routes, and has shown little or no improvement in her ability to operate a tractor trailer in an efficient and safe manner.
>
> Ms. Bowersox was given the same instructions, assistance, and guidance at the beginning of her probationary period that every Equipment Operator working in Correctional Industries laundry operations are given.
>
> After repeated incidents and counseling by her Supervisor, I can find no evidence that she took the necessary actions to improve her performance.  Specifically with regards to driving the tractor trailer.
>
> Ms. Bowersox should be dismissed prior to the completion of her probationary period which effectively ends 8/14/2016.

(Doc. 70-33, pp. 3–4.)  Following the pre-disciplinary conference, Bowersox was

offered a voluntary demotion in lieu of termination, which she refused.  (Doc.

55-6, p. 30.)  Thus, Bowersox's employment was terminated July 28, 2016.  (Doc.

72-17, p. 28.)

On the basis of these facts, Bowersox commenced this civil action on February 14, 2018.  (Doc. 1.)  Defendants filed a motion to dismiss on May 22, 2018.  (Doc. 6.)  Bowersox subsequently filed an amended complaint on June 20, 2018, alleging violations of Title VII, the Pennsylvania Human Relations Act ("PHRA"), 43 PA. STAT. AND CONS. STAT. ANN. § 951, *et seq.*, and the equal protection clause of the Fourteenth Amendment.  (Doc. 8.)  On July 26, 2018, Defendants filed a second motion to dismiss.  (Doc. 11.)  The court granted this motion in part and denied it in part on December 27, 2018, dismissing Bowersox's retaliation claims, as well as her claims under the PHRA and against Defendant Stanton, but denying the motion in all other respects.  (Doc. 18.)  Thus, Bowersox's remaining claims are for sex discrimination under Title VII and the Fourteenth Amendment's equal protection clause.[14]

On June 30, 2020, Defendants filed a motion for summary judgment as to these remaining claims.  (Doc. 44.)  Bowersox filed a brief in opposition, an answer to Defendants' statement of facts, and her own statement of material

---

[14] To the extent not already dismissed by the court's December 27, 2018 order, Bowersox has voluntarily relinquished her claims under the PHRA.  (Doc. 54, p. 5 n.1.)  The court notes that despite this dismissal and voluntary relinquishment, the parties have nevertheless briefed this issue.  However, because the court finds that this claim has been dismissed and otherwise abandoned, the court will not address these arguments.

facts.[15]  (Docs. 53, 54, 73.)  Defendants timely filed a reply brief.  (Doc. 74.)

Thus, the motion for summary judgment is now ripe for review.

## JURISDICTION

Bowersox alleges violations of Title VII and the Fourteenth Amendment

equal protection clause.  (*See* Doc. 8.)  Pursuant to 28 U.S.C. § 1331, the court has

jurisdiction over claims that arise under the laws of the United States.  The Middle

District of Pennsylvania is the proper venue for this matter because all the events

giving rise to the claims occurred in this judicial district.

## STANDARD OF REVIEW

A court may grant a motion for summary judgment when "there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A dispute of fact is material if resolution of

the dispute "might affect the outcome of the suit under the governing law."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Summary judgment is

not precluded by "[f]actual disputes that are irrelevant or unnecessary."  *Id.*  "A

dispute is genuine if a reasonable trier-of-fact could find in favor of the

nonmovant' and 'material if it could affect the outcome of the case."  *Thomas v.*

---

[15] The court notes that Bowersox's statement of material facts is not permitted under the local rules, and that Defendants have objected to the inclusion of this statement in the record.  The court disregards this filing.

*Tice*, 943 F.3d 145, 149 (3d Cir. 2019) (quoting *Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 300 (3d Cir. 2012)).

In reviewing a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Jutrowski v. Twp. of Riverdale*, 904 F.3d 280, 288 (3d Cir. 2018) (citing *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006)). The court may not "weigh the evidence" or "determine the truth of the matter." *Anderson*, 477 U.S. at 249. Instead, the court's role in reviewing the facts of the case is "to determine whether there is a genuine issue for trial." *Id.*

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The non-moving party must then oppose the motion, and in doing so "'may not rest upon the mere allegations or denials of [its] pleadings' but, instead, 'must set forth specific facts showing that there is a genuine issue for trial. Bare assertions, conclusory allegations, or

suspicions will not suffice.'"  *Jutrowski*, 904 F.3d at 288–89 (quoting *D.E. v. Cent. Dauphin Sch. Dist.*, 765 F.3d 260, 268–69 (3d Cir. 2014)).

Summary judgment is appropriate where the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## DISCUSSION

In their summary judgment motion, Defendants argue that Bowersox's Title VII claims are time barred to the extent that she relies on factual allegations that occurred before April 16, 2016—300 days prior to the date she filed her EEOC charge.  (Doc. 47.)  Second, Defendants assert that they are entitled to judgment as a matter of law on Bowersox's discrimination claims on the grounds, that she has failed to establish her prima facie case, and, in the alternative, that she has failed to rebut Defendants' proffered legitimate, nondiscriminatory reasons for her termination.  (*Id.*)  Finally, Defendants York and Vozniak argue that Bowersox's

equal protection claims fail because Bowersox was not treated differently than other DOC employees, these Defendants lacked personal involvement in the decision to terminate Bowersox's employment, and these Defendants are entitled to qualified immunity. (*Id.*) The court will address these arguments in turn.

### A. Some of Bowersox's Allegations Giving Rise to her Title VII Claims are Time Barred, but May Still be Considered for Purposes of Assessing Discriminatory Intent.

Defendants argue that the events prior to April 16, 2016 giving rise to the instant lawsuit are time barred, and are therefore outside of the court's consideration, because these events occurred more than 300 days prior to her EEOC charge, which was filed on February 10, 2017. (Doc. 47, p. 12.) Defendants also assert that some of these events, such as Bowersox's allegations that she did not receive proper training and that inadequate investigations were conducted, fall outside the scope of Bowersox's EEOC charge; thus, Defendants claim that the court may not consider these occurrences. (*Id.* at 13.) Bowersox rejoins that Defendants engaged in a continuing course of conduct, which serves as an exception to the time bar. (Doc. 54, pp. 8–9.) In addition, Bowersox argues that to the extent that her prior interview process to obtain the equipment operator

position is time-barred, the court should otherwise consider these events as indicative of discriminatory intent.  (*Id.* at 9–10.)

Ordinarily, as the Third Circuit has explained, "[t]o bring suit under Title VII, a claimant in a deferral state, such as Pennsylvania, must first file a complaint with the EEOC within 300 days of the alleged unlawful employment practice." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 165 (3d Cir. 2013) (citing 42 U.S.C. § 2000e-5(e)(1)).  Thus, the court cannot consider any discrete acts occurring prior to this date.  *Kimes v. Univ. of Scranton*, 126 F. Supp. 3d 477, 492 (M.D. Pa. 2015).  The Third Circuit has defined "discrete acts" to include "termination, failure to promote, denial of transfer, refusal to hire, wrongful suspension, wrongful discipline, denial of training, [and] wrongful accusation." *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006).

The continuing violation doctrine serves as an equitable exception to this time bar, allowing courts to consider "discriminatory acts that are not individually actionable . . . so long as they are linked in a pattern of actions which continues into the applicable limitations period."  *Mandel*, 706 F.3d at 165 (citing *O'Connor*, 440 F.3d at 127).  Therefore, a plaintiff must prove that at least one discriminatory act occurred within the limitations period and that this alleged wrong "is more than the occurrence of isolated or sporadic acts."  *Kimes*, 126 F. Supp. 3d at 492.  To make this determination, courts may consider subject matter, i.e., "whether the

violations constitute the same type of discrimination[,]" and frequency, i.e., "whether the acts are recurring or more in the nature of isolated incidents[.]" *Mandel*, 706 F.3d at 166 n.2; *Kimes*, 126 F. Supp. 3d at 492.

In this case, several allegedly discriminatory acts occurred within the relevant time period. Bowersox was subject to a negative progress review on May 20, 2016, she received a negative employee performance review on June 24, 2016, an unfavorable pre-disciplinary conference was held on July 15, 2016, and her employment was terminated on July 28, 2016. (Doc. 69-12, p. 2; Doc. 70-30, p. 7; Doc. 70-33; Doc. 72-17, p. 28.) She filed her complaint with the EEOC on February 10, 2017, well within the 300-day statute of limitations. However, many of the alleged acts that Bowersox uses to support her Title VII and section 1983 discrimination claims are individually actionable discrete acts from which the limitations period runs.[16] Specifically, Bowersox's alleged instances of discrimination can be categorized as Defendants' refusal to hire her, wrongful discipline, denial of training, and wrongful accusations, all of which the Third Circuit has explicitly excepted from the continuing violation doctrine, *see O'Connor*, 440 F.3d at 127, and many of which occurred prior to April 16, 2016.

---

[16] The Third Circuit has held that "the distinction between 'continuing violations' and 'discrete acts' is not an artifact of Title VII, but is rather a generic feature of federal employment law." *O'Connor*, 440 F.3d at 128. Thus, the Circuit has held that principles exempting discrete acts from the continuing violation doctrine under Title VII are equally applicable to claims brought under section 1983. *Id.*

Indeed, Bowersox was removed from her truck driving duties effective March 1, 2016, and all of the alleged performance deficiencies listed in Vozniak's journal occurred prior to this date.

In the court's view, these occurrences constituted alleged wrongful discipline and accusations, each of which gave rise to their own actionable claim under Third Circuit precedent, which Bowersox failed to bring within the applicable statute of limitations. Thus, the court cannot consider these occurrences as part of the continuing violation doctrine, and they cannot give rise to an independent claim under Title VII or section 1983. To this limited extent, Defendants' motion for summary judgment is granted.

Despite this finding, the court notes that it may consider occurrences prior to April 16, 2016 for purposes of assessing Defendants' discriminatory intent, even though they are otherwise time-barred. *See Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 433 (3d Cir. 1997) (citing *United Air Lines v. Evans*, 431 U.S. 553, 558 (1977) ("A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences.")); *Bullock v. Brandywine Sch. Dist.*, 837 F. Supp. 2d 353, 359 n.3 (D. Del. 2011); *McBride v.*

*Princeton University*, No. 90-838, 1991 U.S. Dist. LEXIS 5677, at \*26 (D.N.J. Apr. 24, 1991).

### B. Defendants' Motion for Summary Judgment will be Denied as to Bowersox's Title VII and Equal Protection Claims.[17]

Defendants argue that Bowersox cannot maintain her prima facie case of sex discrimination, and, in the alternative, has failed to prove pretext necessary to sustain her burden under Title VII.  (Doc. 47, pp. 13–22.)  Defendants also assert that Bowersox was not treated differently than any of her co-workers, and that she was otherwise not similarly situated to other co-workers.[18]  (*Id.* at 22–26.) Bowersox counters that she has satisfied her burden under Title VII, and, in the alternative, that there is a dispute of material fact raised regarding whether these claims should proceed.  (Doc. 54, pp. 10–26.)

---

[17] The court's discussion regarding Bowersox's Title VII claims is equally applicable to her section 1983 claims, and they are accordingly discussed together.  *Starnes v. Butler Cty. Ct. of Common Pleas*, 971 F.3d 416, 426 (3d Cir. 2020) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n. 1 (1993); *McKenna v. Pac. Rail Serv.*, 32 F.3d 820, 825 n.3 (3d Cir. 1994); *Lewis v. Univ. of Pittsburgh*, 725 F.2d 910, 915 n.5 (3d Cir. 1983) (explaining that Title VII and § 1983 share the same elements for discrimination purposes)).

[18] Defendants rely on *Machon v. Pa. Dep't of Pub. Welfare*, 847 F. Supp. 2d 734, 748–49 (E.D. Pa. 2012) for the proposition that "'a class-of-one' theory of equal protection has no place in the public employment context," and that summary judgment should accordingly be granted because Bowersox was discharged from employment in the public sector.  *Id.*  The court finds that *Machon* has no applicability to the instant dispute and that Defendants attempt to misclassify Bowersox's claims.  Bowersox has not alleged that she is pursuing her equal protection claims on a class-of-one theory.  Rather, Bowersox claims that her status as a member of a protected class, i.e., as a woman, forms the basis for her equal protection claims.  Thus, the court finds that Defendants' reliance on *Machon* is misplaced and disregards this argument.

In relevant part, Title VII provides that it is "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a)(1).  "The Equal Protection Clause [likewise] proscribes sex-based discrimination."  *Starnes*, 971 F.3d at 426 (citing *Keenan v. City of Philadelphia*, 983 F.2d 459, 465 (3d Cir. 1992)).  Here, Bowersox's claims are based on circumstantial evidence of discrimination, and are accordingly governed by the *McDonnell Douglas* burden-shifting framework.  *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The *McDonnell Douglas* framework contains three steps.  At the first step, the plaintiff must establish a prima facie case of discrimination.  *Burton v. Teleflex, Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  If the plaintiff meets that burden, the burden of production shifts to the defendant to offer a legitimate, nondiscriminatory reason for the adverse treatment of the plaintiff.  *Id.*  The burden then shifts back to the plaintiff to show that the proffered nondiscriminatory reason was a pretext for discrimination.  *Id.* at 427.

### 1. Bowersox Has Satisfied Her Prima Facie Case.

To establish a prima facie case of sex discrimination at the first step of the *McDonnell Douglas* framework, a plaintiff must show that: "(1) she is a member of a protected class; (2) she was qualified for the position in question; (3) she

suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 842 (3d Cir. 2016) (citing *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999)).  The Third Circuit has explained that a plaintiff's "prima facie case 'is not intended to be rigid, mechanized, or ritualistic.'" *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 644 (3d Cir. 2015) (quoting *Pivirotto v. Innovative Sys.*, 191 F.3d 344, 352 (3d Cir. 1999)).  At the summary judgment stage, the plaintiff's burden is to show that there is sufficient evidence "to convince a reasonable factfinder to find all of the elements of the prima facie case." *Burton*, 707 F.3d at 426 (quoting *Duffy v. Paper Magic Grp., Inc.*, 265 F.3d 163, 167 (3d Cir. 2001)).

Here, viewing the facts in the light most favorable to Bowersox, the court finds that she has met her burden to establish a prima facie case of sex discrimination.  It is undisputed that Bowersox was a member of a protected class as a woman and was otherwise qualified for her position, based simply on the fact that Defendants chose to hire her.  It is also clear that she suffered an adverse employment action when her employment was terminated.[19]  Finally, viewing the

---

[19] The court disagrees with Bowersox's argument that events other than the termination of her employment constituted adverse employment actions.  An "adverse employment action" is defined as any action that "alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee." *Budhun v. Reading Hosp. & Med. Ctr.*, 765 F.3d 245, 257 (3d Cir. 2014) (internal quotation omitted).  Some examples of adverse employment actions recognized

facts generously, there is sufficient evidence for a fact-finder to conclude that the

termination of Bowersox's employment "occurred under circumstances that could

give rise to an inference of intentional discrimination."  *Mandel*, 706 F.3d at 169.

Initially, it is undisputed that Bowersox was the only woman to be hired as

an equipment operator for Corrections Industries after two unsuccessful application

attempts and numerous interviews spanning two to three years.  It was only after

Bowersox filed an EEOC charge alleging discrimination on the basis of sex that

she was notified by Vozniak that she had been hired.  There is evidence that Miller

stated that Bowersox was hired because she is a woman.

Almost immediately after she began her employment, Defendants began

papering her file with instances of negative performance.  Indeed, many of these

alleged instances occurred during her first month of employment, some occurred

during her first week of training, and others occurred when she was not even

cleared to begin driving CDL vehicles.  Thereafter, it appears that Vozniak's

journal, Bowersox's removal from her truck driving duties, the negative

performance and progress reviews, the pre-disciplinary conference, and her

---

by the Supreme Court include a "significant change in employment status, such as hiring, firing, failing to promote, reassignment, or a decision causing a significant change in benefits." *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742, 749 (1998).  While the negative reviews occurring after April 16, 2016 may have contributed to the ultimate decision to terminate Bowersox's employment, there is no evidence that they served to alter her employment status, and therefore cannot be considered adverse employment actions for purposes of the Title VII analysis.

ultimate discharge were precipitated by Miller in some fashion.  (Doc. 55-3, p. 279; Doc. 55-4, p. 70; Doc. 69-9, p. 3; Doc. 71-15, p. 81.)   Miller is the same supervisor who observed that Bowersox was hired because she was a woman.

Indeed, the court finds it curious that immediately after hiring the first woman as an equipment operator for Corrections Industries at SCI-Benner, Defendants began building a record upon which they could justify her removal. Thus, viewing the facts in the light most favorable to Bowersox as the non-movant, the court finds that a reasonable jury could trace back these events, considering the totality of circumstances surrounding Bowersox's employment experience with Corrections Industries, to demonstrate that Miller maintained some measure of animus toward Bowersox, which may have been based on her sex.  The court notes that this is a close case, but that Bowersox has presented enough evidence at this stage to establish her prima facie case in light of the fact that a "prima facie case 'is not intended to be rigid, mechanized, or ritualistic.'"  *Willis*, 808 F.3d at 644 (quoting *Pivirotto*, 191 F.3d at 352).

### 2. Defendants Have Produced a Legitimate Non-Discriminatory Reason for Terminating Bowersox's Employment.

Having found that Bowersox has established a prima facie case of sex discrimination based on the circumstances surrounding her employment and the events leading up to the termination thereof, the burden shifts to Defendants to offer a legitimate, nondiscriminatory reason for the adverse employment action.

*Burton*, 707 F.3d at 426.  "This burden is 'relatively light' and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason."  *Id.* (quoting *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006)).

In this case, Defendants have met their burden of showing a legitimate, nondiscriminatory reason for the adverse action against Bowersox because they have offered evidence that Bowersox's employment was terminated after she failed to satisfactorily complete her probationary period due to being labeled as a safety and security risk at one of the correctional institutions she frequented.  (Doc. 72-17, p. 28.)  Indeed, the record is replete with examples of Bowersox's alleged poor performance.  Vozniak recalled that, inter alia, Bowersox forgot routes and stops; would need to call him for directions regardless of how many times she had been to the institution at issue; returned from her routes later than other drivers; frequently locked her keys in her truck; received complaints from correctional institutions regarding her performance, including a notice that she had almost hit a corrections officer escorting her to the laundry dock, was guilty of speeding within the institution's perimeter, and frequently left her truck unsecured; failed to properly complete pre- and post-trip documentation; and took too long to back up tractor trailers without improvement.  These performance issues are reflected in both of Bowersox's performance evaluations and her pre-disciplinary conference.

Thus, given the "relatively light" burden that Defendants face at this stage, the court concludes that they have easily reached this threshold.

### 3.    Bowersox Has Produced Evidence Such That a Factfinder Could Reasonably Disbelieve Defendants' Articulated Legitimate Reasons for the Termination of Her Employment.

Accordingly, the burden shifts back to Bowersox to show that the proffered nondiscriminatory reason was a pretext for sex discrimination. *Burton*, 707 F.3d at 427. To meet her burden at this stage, a plaintiff must "point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Id.* (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)).

Viewing the facts in the light most favorable to Bowersox, there is a dispute of material fact regarding the third stage of the *McDonnell Douglas* framework. In support of her assertion that Defendants' nondiscriminatory reason was a pretext for sex discrimination, Bowersox claims that many of Defendants' reasons for terminating her employment were false or inaccurate, that she was not given an opportunity to improve her performance, and that other equipment operators received less severe punishment than her, all of which could lead a reasonable jury to disbelieve Defendants' reasons for termination. (Doc. 54, pp. 18–26.)

The court finds that Bowersox has, at a minimum, created a dispute of material fact regarding whether Defendants' articulated reasons for the termination of her employment were accurate.  Indeed, according to Bowersox, much of the documentation surrounding her alleged performance issues was inconsistent with the record, Defendants' own internal procedures, and her recollection of events. For example, Bowersox notes that many of the alleged serious instances of poor performance that would appear to justify documentation, such as the accusation that she almost hit a corrections officer while being escorted to the laundry dock, did not appear in the record either as a journal entry from Vozniak or as an incident report, and that the corrections officer who was allegedly almost hit by her truck stated that he did not feel the need to move away from her truck.  In addition, while Miller had directed Vozniak to keep a journal of Bowersox's daily activities, and encouraged Vozniak to keep documenting instances of poor performance, Vozniak testified that he remembered more instances of poor performance than were written in his journal.  This lack of documentation was explained by Vozniak's testimony that he stopped writing down every alleged instance of poor performance, contrary to Miller's directive.  The court also notes that some of Vozniak's notes were contradicted by the record.  For example, while Vozniak recalled that it consistently took Bowersox between 20 and 25 minutes to back up her truck square

with the dock, Engelhardt testified that it took Bowersox about five minutes to perform this task and that she got better the more times she did it.

Some of the documentation that appears in the record, such as her negative performance reviews, were conducted later than Defendants' protocols dictated, which could give rise to the inference that Defendants were attempting to build a case against Bowersox to justify her discharge. Specifically, her progress review, which is ordinarily supposed to serve as a feedback mechanism to allow her to improve her performance, was not administered until May 2016, almost two months after she had already been removed from her truck driving responsibilities, when she was no longer able to implement any constructive feedback that the review could offer, and almost five months later than it was typically conducted. Indeed, in light of the fact that Stanton was aware that Miller wanted to terminate Bowersox's employment as of April 2016, a reasonable jury could conclude that her progress review, conducted one month later, served to paper her record in support of this decision.

Moreover, her employee performance review, which purported to cover additional time and offer another opportunity for constructive feedback on her performance, was conducted on June 24, 2016 and passed through several versions based on feedback and input from individuals other than her direct supervisor despite the fact that Vozniak was solely responsible for conducting this review. By

this point, Bowersox had not been reinstated to her truck driving duties, had been working in the laundry facility for almost three months, and was therefore unable to implement any of the feedback provided in the review.  Furthermore, there was nothing new that this review would have covered with respect to her driving responsibilities since she had been removed from those responsibilities during the review period.  In other words, the June employee performance review appeared to serve as a formality, given that Bowersox did not have an opportunity to continue driving a truck after her initial progress review was conducted.

Bowersox also notes that her version of events was largely discounted throughout her employment as an equipment operator.  Indeed, she asserts that her performance did improve after her first month, and she denies that she frequently locked her keys in her truck and that she presented a safety concern to the institutions she frequented.  In reaction to her assertions, Defendants found her to be "less than truthful" during a fact-finding proceeding based on their own assessment of her credibility and without any supporting evidence in the record.

Finally, Bowersox notes that other employees were not subject to the same treatment.  For instance, Basehore testified that he had never made changes to an employee's performance review when he was not the reviewing officer until Bowersox's case.  (Doc. 70-1, p. 245.)  In similar fashion, Miller testified that he did not normally request that supervisors provide daily logs on equipment

operators' activities, but that he did so in Bowersox's case.  (Doc. 71-11, p. 67.)

Bowersox also recalls that she heard other equipment operators also working under

Vozniak's supervision discussing locking their keys in their truck and returning

late from their routes, and that they were not punished for these offenses.

These discrepancies in the record have created a dispute of material fact

based on witness credibility and differing recollections of the events during

Bowersox's employment.  Noting that issues of witness credibility are "peculiarly

within the jury's domain," and that "it is emphatically not the province of the court

to weigh evidence . . . when passing upon a motion for summary judgment," the

court declines to grant summary judgment as to this claim.  *United States v. John-*

*Baptiste*, 747 F.3d 186, 208 (3d Cir. 2014) (quoting *United States v. Cothran*, 286

F.3d 173, 176 (3d Cir. 2002)); *White v. Wireman*, No. 1:16-cv-675, 2019 U.S. Dist.

LEXIS 218644, at *15 (M.D. Pa. Dec. 19, 2019), *report and recommendation*

*adopted*, No. 1:16-cv-675, 2020 U.S. Dist. LEXIS 29769, at *1 (M.D. Pa. Feb. 21,

2020).

### C. Defendants Vozniak and York May Not Claim Qualified Immunity and Were Personally Involved in the Decision to Terminate Bowersox's Employment.

Finally, Defendants Vozniak and York argue that they should be shielded

from personal liability based on a lack of personal involvement in the decision to

terminate Bowersox's employment and qualified immunity.  Bowersox counters

that Vozniak and York were intimately involved in the decision to terminate her employment by consistently papering her record with negative performance evaluations that they knew would lead to her ultimate discharge and that the disputes of material fact raised in this case preclude a finding that Vozniak or York are entitled to qualified immunity.  (Doc. 54, pp. 26–29.)

The court agrees with Bowersox, noting that Vozniak and York were personally involved in every negative review, notation of poor performance, and suggestion of incompetence that was relayed to upper management, knowing that these actions would likely lead to a negative employment action for Bowersox. Indeed, to say that these Defendants lacked personal involvement in the ultimate decision to terminate Bowersox's employment merely because they did not have the authority to do so ignores the context in which Bowersox lost her equipment operator position.  But for Vozniak and York's involvement in this case through their reports of poor performance, Bowersox would not have lost her job.  The law does not require personal involvement in the termination decision; rather, it requires personal involvement in the alleged violation of Bowersox's rights, which may be demonstrated in this case.  *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).

The doctrine of qualified immunity recognizes that despite their participation in constitutionally impermissible conduct, government officials "may nevertheless

be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The doctrine "protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow*, 457 U.S. at 818).  "The issue of qualified immunity is generally a question of law, although a genuine issue of material fact will preclude summary judgment on qualified immunity." *Giles v. Kearney*, 571 F.3d 318, 325–26 (3d Cir. 2009).

Because the court has found that there is a dispute of material fact regarding whether Bowersox was subject to discrimination under Title VII and the equal protection clause, Defendants Vozniak and York cannot claim qualified immunity at this stage.  Therefore, summary judgment will also be denied on these grounds.

## CONCLUSION

For the foregoing reasons, the court will grant summary judgment to foreclose Plaintiff from maintaining a cause of action based on any alleged adverse employment actions other than her termination, and deny the motion in all other respects.  An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated: February 22, 2021